## Taite Estate

*Thomas J. Timoney,* of *Timoney, Knox, Avrigian & Hasson,* for accountants.

*Catherine G. Barone,* Assistant Attorney General, and *Richard N. Spare,* Special Assistant Attorney General, for Commonwealth.

TAXIS, P. J., March 21, 1972.—The reason or purpose for the filing of the account is the death on December 24, 1970, of Rhoda Hopkins Taite, life tenant and cotrustee, and testatrix' last surviving child. Decedent died on July 25, 1924, and created the present trust of the residue of her estate for the benefit of her three children, Frank Griffiths Taite, Joseph Gould Taite and Rhoda Hopkins Taite, for their lives. Under further provisions of the will and under certain conditions which have occurred, testatrix' last surviving child was given the right and power by will to dispose of the principal of this trust. Testatrix' husband, Frank G. Taite, who died on

December 14, 1915, also left a will with substantially identical provisions concerning the disposition of his estate by his last surviving child.

Rhoda Hopkins Taite has exercised the powers given her, and has created 40 separate trusts out of the principal of the two estates, 20 in the present estate and 20 in the Estate of Frank G. Taite, for 20 named beneficiaries. The trustee has filed a petition to combine these trusts which has been discussed in detail in an adjudication of even date in the Estate of Frank G. Taite, deceased, no. 30708, in this court. For the reasons set forth therein, it is ordered and decreed that the 40 separate trusts arising from the assets of this trust and the assets of the trust of Frank G. Taite, aforesaid, be combined and administered as 20 separate trusts under the provisions of the will of Rhoda Hopkins Taite, deceased.

A dispute concerning transfer inheritance tax liability has been submitted for decision. The Commonwealth asserts the right to assess additional tax at the present time, because, under the exercise of the testamentary power of appointment by Rhoda Hopkins Taite, final distribution of the estate will be to collaterals, and tax was previously paid only at the rate applicable to direct heirs. The applicable law is the Inheritance Tax Act in effect at decedent's death, the Act of June 20, 1919, P. L. 521.

By paragraph Second of her will, testatrix created a trust of her entire residuary estate, and gave the income thereof equally to her three children for their lives, as above noted. If a child died leaving issue, the child's share was to descend to such issue under the intestate laws. If a child of testatrix died without issue, his or her share was given to testatrix' other children and their issue. Testatrix then provided: "It is my will that my last surviving child (if none left

issue) shall have the right and power to will and dispose of the principal of my Estate of which he or she shall have been receiving the income." All of testatrix' children are now deceased, and none left issue. Thus, the principal of this trust will now pass to collaterals, under the terms of the power of appointment as exercised by Rhoda Hopkins Taite.

The original inheritance tax appraisement, in 1924, stated: "The Executors have agreed to pay the entire tax at this time. . . The decedent's estate is subject to Direct Inheritance Tax of two per cent, as the estate passes to the decedent's children. . ." Tax was paid at two percent on the clear value of the entire estate. The first trust account was filed in 1942, on which occasion the inheritance tax certificate read, ". . .The tax assessed was paid in full upon the first account of the executors." The second trust account was filed in 1962, and at that time the inheritance tax certificate stated, ". . . The tax assessed has been paid but should any portion pass to collateral heirs additional tax will become due." The inheritance tax certificate submitted at the present time reads similarly. Except for the instant proceeding, no appeals have been taken at any time; but it does not appear that any distribution of trust assets has heretofore occurred. The collateral rate under the 1919 Act, supra, is 10 percent. It must also be noted that the 1924 appraisement contained no reservation of any right to assess additional tax in the future for any reason, including the possibility that assets might pass to collaterals. This is also true of the 1942 certificate.

Section 3 of the 1919 Act reads as follows:

"Where there is a transfer of property. . . to take effect in possession or to come into actual enjoyment after the expiration of any one or more life-estates

or a period of years, the tax on such estate shall not be payable, nor shall interest begin to run thereon, until the person liable for the same shall come into actual possession of such estate by the termination of the estates for life or years. The tax shall be assessed upon the value of the estate at the time the right of possession accrues to the owner, but the owner may pay the tax at any time prior to his coming into possession. In such case, the tax shall be assessed on the value of the estate at the time of the payment of the tax, after deducting the value of the life-estate or estates for years."

This postponement of the tax liability is a reflection of the fact that the inheritance tax is not a tax on property as such, but on the right of succession or the privilege of receiving property: Houston's Estate, 276 Pa. 330. This being so, no tax is *demandable* by the Commonwealth from the owner of a remote interest until the property actually comes into his possession; but nothing in the act *prevents* the payment of the tax before that time if the party or parties in interest choose to do so.

In the present case, the 1924 appraisement included, inter alia, the assets which the Commonwealth now proposes to reassess. The 1924 appraisement was a final one by its own terms, although it was clear even at that time, though unlikely, that the estate could ultimately pass to collaterals. However, no right to reassess in accordance with subsequent events was reserved, although such a reservation could have been made (Reynolds Estate, 359 Pa. 616), and would have effectively prevented the assessment from being final.

In our opinion, this was precisely the sort of mistake of judgment which has consistently been held remediable by appeal, but not by a second assessment.

The leading case is Darsie Estate, 354 Pa. 540, decided under the provisions of the 1919 Act. There, we find the following statements:

"We have uniformly decided that when assets of an estate are appraised, and the tax assessed, in the absence of an appeal, the action is final": Page 541.

"It is stated by the appraiser on the face of the present appraisement and assessment that the estate was *'Taxable at 2%* See Will.' We agree . . . that this . was a *final* appraisement and assessment and was intended so to be. The mistake of judgment by the Commonwealth in its appraisement and assessment of 1928 was the failure to appraise the value of the life estate and to assess a transfer inheritance tax of 2% thereon; . . . As it would be obviously impossible to ascertain, until the widow's death, what principal she had consumed (assessable at 2%), and what residue passed to collaterals (assessable at 10%), these items should have been suspended until the life tenant's death. . . . This is not a case of *after-discovered assets* . . .": page 542.

Earlier, the Supreme Court had also said in Heberton Estate, 351 Pa. 564, 567:

"In our opinion, it makes no difference whether the mistake of judgment applies to the taxability of an asset, . . . or a mistaken conclusion that the remainder will be subject to the collateral tax instead of the direct. In either case, the assessment is final and conclusive on both the taxpayer and the Commonwealth and cannot be challenged except by an appeal."

The principal argument of the Commonwealth here is that Carver Estate, 422 Pa. 609, has changed these rules, at least with respect to fact situations like the present one. In Carver, decedent created an inter vivos trust in 1906, with income to himself and then his wife for life, remainder to his children or in default thereof,

as decedent might appoint by will. Carver died in 1919 without children, and the inventory of his estate did not include the assets of the trust nor did the inheritance tax appraisement. At Mrs. Carver's death in 1963, the corpus of that trust passed to collaterals under provisions of decedent's will. It was held that the inter vivos trust property could be appraised in 1963, and assessed at that time with inheritance tax at the collateral rate, even though there had been a prior final assessment of the other assets in decedent's estate.

The Supreme Court stated, in affirming the Orphans' Court of Delaware County, that the only relevant time when the trust assets could have been appraised effectively was when they came into the possession of the remaindermen, or when the tax was prepaid, which had not been done. The court said, at page 613:

"Even if the Commonwealth had appraised the remainder interests under the 1906 deed of trust at the time of decedent's demise, as appellants contend it was required to do, a second appraisement would now be required in order to comply with the statutory direction that the tax be assessed 'upon the value of the estate at the time the right of possession accrues to the owner.' . . . In the instant case, the right of possession did not accrue until the expiration of the interest of decedent's wife in 1963. It was, therefore, not until that time that an appraisal of any legal significance could have been made by the Commonwealth. . ."

It is worthy of note that the court did not say what would have been the result had an appraisement of the trust assets actually been made at decedent's death, and the tax paid at a direct rate; that issue was not before it. Nor did it consider the second contention of the Commonwealth, made in the court below (Carver

Estate, 15 Fiduc. Rep. 437) that there had been no disclosure of the assets at the time of the original appraisement, and, consequently, the appraisement actually was not a reappraisement but an original appraisement.

The effect of Carver Estate on the existing rules barring second appraisements was considered in Altemus Estate, 44 D. & C. 2d 499, 18 Fiduc. Rep. 304. The court pointed out that an appraisement both fixes the value of assets, and determines the liability of those assets for the tax, including the rate. When these matters are finally established, the result can only be attacked by appeal, not by reappraisement. In Altemus Estate, there was no inadequate disclosure, as the inventory filed contained all of the assets owned by decedent, including those which the Commonwealth sought to subject to a second appraisement. In the opinion of the auditing judge, Carver Estate did not apply to such a factual situation, since (page 505) ". . . it is really dealing with the proper time to make an original appraisement; . . ."

Upon exceptions, the issues were reconsidered at length in an opinion by Judge Lefever, and the same result reached. In so doing, the court emphasized the fact that the appraisement in Carver, although a second appraisement in the estate, was an original appraisement with respect to the assets involved. The opinion of the lower court in Carver bears out this distinction in saying:

". . . there is no merit in appellant's (estate's) position that the appraisement of March 2, 1964 is an attempt, forty-four years later, to impose a transfer inheritance tax on an asset which the Commonwealth had overlooked and should have taxed immediately after decedent's death in 1919": 15 Fiduc. Rep. at 443.

In Altemus, the Philadelphia Orphans' Court echoed this observation and said:

"It is clear . . . that the learned hearing judge in the instant case correctly held that the issue in Carver Estate was the determination as to whether an original appraisement was proper and *not* whether the Commonwealth has the right to make a *second appraisement or a reappraisment . . .*

". . .

"In contrast, full and complete disclosure of all the assets was originally made to the tax appraiser in the instant case. He filed appraisements on May 12, 1912, and October 2, 1913, without taxing the assets now at issue. It follows that the facts in the instant case are vitally different from Carver Estate. Therefore, the ruling in Carver Estate does not apply . . .": 44 D. & C. 2d 507, 509.

It is evident that the Supreme Court, in its opinion in Carver, did not overrule or diminish the rules of Heberton Estate, Darsie Estate and Reynolds Estate, supra. At page 614, each is distinguished. The distinction drawn with respect to Darsie and Heberton was that ". . . the Commonwealth was precluded from appraising the remainder interests there involved . . . , since it had previously appraised and assessed a tax upon the assets comprising the trust corpus as a part of the decedent's estate passing to the life tenant, who, in both cases, enjoyed the power to consume the corpus of the trust."

This, of course, describes a valid factual difference between Darsie and Heberton on one hand (and the case before us, as a matter of fact, except that here a tax on the whole estate was voluntarily paid), and Carver on the other; but it only goes part way in distinguishing the holdings in these cases from each other. It is true that, in Darsie and Heberton, the life

tenant had a power to consume principal, which power was taxable at direct rates; hence, the Commonwealth probably did have an immediate right upon decedent's death to *demand* a two percent tax on the remainder as well as the life estate. This fact justified an immediate assessment of tax upon the whole estate; but it in no way explained the error in judgment on the part of the Commonwealth appraisement, which, just in the present case, failed to suspend or defer a final assessment until the future facts could be known. In short, whether there is an immediate right to tax a "power to consume" or not, the only way to assess *additional* tax on assets already taxed, based on their ultimate distribution to collaterals, is to reserve a right to do so specifically. This rule controls here, and in our opinion has not in any way been changed by Carver Estate, supra.

No case, in a long line of inheritance tax appraisement cases, has ever held that, after assets have been finally appraised and the tax determined and assessed, there may be a reappraisement of those assets, because an error of judgment was made as to the applicable rate of tax. The 1919 Act specifies that remainder interests be valued and assessed when they come into possession or when the tax is paid, and it is obvious in the present case that prepayment was the effect of the Commonwealth's appraisement, which no one appealed. Neither the Commonwealth nor a taxpayer can be heard to say that facts which developed *subsequent* to a final appraisement can justify the correction of an error of judgment, when the proper procedure for this purpose, an appeal, was never taken.

In summary, we find that the appraisement in this estate was final and unappealed, that it included the

assets presently sought to be reassessed, and that a tax was paid on the clear value of the entire estate in 1924, exactly in accordance with the terms of the appraisement. Under such circumstances, no additional tax may be assessed or collected . . .

And now, March 21, 1972, this adjudication is confirmed nisi.